Unpublished opinions are not binding precedent in this circuit.
DIAZ, Circuit Judge:
Jay Neil and Erika K. Neil[1] appeal the district court’s grant of summary judg *215 ment to Defendants Wells Fargo Bank, N.A; BWW Law Group, LLC; Equity Trustees, LLC; and Banc of America Funding Corporation, 2005-4 Trustees (collectively “Wells Fargo” or “Defendants”).[2] We agree with the district court that Wells Fargo was not obligated to modify the Neils’ mortgage loan. The Neils therefore defaulted on their loan; Wells Fargo is entitled to ■ summary judgment, and we affirm.
I.
A.
The Neils obtained a $604,000 loan in 2005 secured by a deed of trust on their home in Centreville, Virginia. In 2009, they asked the servicer of their mortgage, Wells Fargo, for a loan modification. In response, the Neils received two letters from Wells Fargo. The first—headlined: “You may qualify for a Home Affordable Modification Trial Period Plan”—offered to reduce the Neils’ monthly payment for three months. The letter requested that they sign and return an attached Trial Period Plan (“TPP”), which reduced the Neils’ loan repayment to $2,655.77 per month from November 2009 through January 2010. The second letter told the Neils ‘You did it!”—“it” being having “enter[ed] into a Home Affordable Modification Trial Period Plan.” J.A. 100. The TPP, along with the two letters, outlined how the Neils could apply and qualify for a permanent loan repayment modification under the Home Affordable Modification Program (“HAMP”).[3]
The Neils began repaying the loan at the reduced amount and continued to do so after the trial period ended. Wells Fargo subsequently notified the Neils that they were behind on their loan repayment and in default and, in September 2010, denied the Neils’ request for a permanent loan modification. The bank’s stated reason for declining to modify the Neils’ loan was that the net present value (“NPV”) of modification, as calculated by Wells Fargo, was not “acceptable to the investor that owns [their] mortgage.” The Neils stopped making monthly payments in September 2011.
On March 7, 2013, the Neils’ home was sold in foreclosure. The Neils then brought suit in state court, seeking to invalidate the foreclosure and alleging that Wells Fargo breached the TPP. Wells Fargo removed the case to the U.S. District Court for the Eastern District of Virginia pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.
B.
The Neils asserted ten counts against Defendants. Wells Fargo sought dismissal of the Plaintiffs’ complaint for failure to state a claim, which the district court granted. The Neils appealed and we vacated the district court’s decision. Specifically, we disagreed with the district court’s conclusion that the TPP was not supported by consideration and therefore not a valid contract. Neil v. Wells Fargo Bank, N. A., *216 596 Fed.Appx. 194, 196-97 (4th Cir. 2014) (per curiam) (Neil I). We did not rule on the precise terms and conditions of the contract, leaving its interpretation to the district court. Id. at 197 n.5.
Because the Neils appealed only the dismissal of four of their ten counts, the claims remaining for the district court on remand were: Count I for breach of contract; Count II for slander of title; Count III for abuse of process; and Count IV to remove cloud on title. Wells Fargo counterclaimed for breach of contract, alleging that the Neils defaulted on their mortgage and seeking a deficiency judgment. In their reply to Wells Fargo’s counterclaim, the Neils claimed that the bank did not have standing to collect on the Note. Both sides moved for summary judgment.
The district court denied the Neils’ motion for summary judgment, held that Wells Fargo had standing to pursue its counterclaim for breach of contract, and granted the Defendants’ motion except as to the amount of counterclaim. After the parties stipulated to the amount of the deficiency on the mortgage, the district court entered judgment for Wells Fargo on its counterclaim in the amount of $122,000.
This appeal followed,
II.
We review de novo the district court’s grant of summary judgment, Ray Commc’ns, Inc. v. Clear Channel Commc’ns, Inc., 673 F.3d 294, 297 n.1 (4th Cir. 2012). After Neil I, the district court had to, as a preliminary matter, interpret the TPP to determine whether it required Wells Fargo to permanently modify the Neils’ loan. On this question turned all of the Neils’ remaining claims as well as Wells Fargo’s counterclaim. Because we agree that Wells Fargo was not required to modify the Neils’ loan after calculating a negative NPV, we hold that the bank did not breach its contract. As a result, the Neils defaulted on their mortgage, and the district court correctly granted summary judgment to Wells Fargo.
A.
In Count I, the Neils accuse Wells Fargo of breaching the TPP by refusing to permanently modify their mortgage loan payments, despite the Neils’ compliance with all terms of the contract. If the contract were governed by HAMP, however, then Wells Fargo could decline to modify after calculating a negative net present value.
1.
The Neils contend that the “four corners” of the TPP contract “said nothing of any [NPV] requirement” and therefore, the contract was not governed by HAMP rules and Wells Fargo couldn’t deny a loan modification because of a negative NPV. Appellants’ Br. at 21-22. According to Neils’ reading of the contract, so long as the information they provided Wells Fargo upon entering into the TPP “remain[ed] true,” Wells Fargo was' required to modify. Id. at 11-12.
But the plain language of the contract— indeed its title—references the “Home Affordable Modification Program.” J.A. 95. The contract further states that the Neils’ personal information may be given to “the U.S. Department of the Treasury” and “companies that perform support services for the Home Affordable Modification Program.” J.A. 97. The Neils would have us ignore this language, but Wells Fargo would give it force and have it govern the parties’ conduct. Where contract language “admits of being understood in more than one way,” as it does here, the language is ambiguous, and we may look to parol evi- *217 denee to clarify the ambiguity. Renner Plumbing, Heating and Air Conditioning, Inc. v. Renner, 225 Va. 508, 303 S.E.2d 894, 898 (1983). Here, the parol evidence shows that the parties agreed to a temporary HAMP modification with permanent modification contingent on a positive NPV.
The cover letter to the TPP conditioned modification and avoiding foreclosure on the Neils “qualify[ing] under the federal government’s Home Affordable Modification program and comply[ing] with the terms of the Trial Period Plan.” J.A. 91 (emphasis added). It encouraged the Neils to accept the TPP in order to “see if [they] qualified] for a Home Affordable Modification.” J.A. 92. The cover letter described the TPP as “the first step,” with a finalized modification coming only after Wells Fargo “confirm[ed] [the Neils’] income and eligibility for the program.” J.A. 93. The TPP’s attached “frequently asked questions” sheet even addressed what happens when a borrower enters into the TPP but does not subsequently qualify for HAMP. J.A. 94.
In short, Wells Fargo made it clear that compliance with the express terms of the TPP was necessary but not sufficient for the Neils to receive a permanent modification; qualification under HAMP—specifi-cally, a positive NPV—was the other necessary element and a condition of the TPP. That contention squares with our decision in Neil I, where we explained that the TPP was “relate[d] to a- federal program ... called the Home Affordable Modification Program” and that the Neils’ reduced mortgage payments were temporary unless they “ultimately qualified for HAMP.” 596 FedAppx. at 195.
2.
Under a TPP governed by HAMP, the lender is “required to offer some sort of good-faith permanent modification ... consistent with HAMP guidelines” once the borrower “fulfill[s] the TPP’s conditions.” Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 565 (7th Cir. 2012); see also Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 235 (1st Cir. 2013) (rejecting lender’s contention that, after borrower met all the conditions of the TPP, it could still refuse to permanently modify). We do not hold otherwise. We do, however, examine whether the condition precedent triggering Wells Fargo’s duty to modify occurred—that is, whether the Neils “fulfilled the TPP’s conditions.” Wigod, 673 F.3d at 565.
Because the TPP was governed by HAMP, one of the conditions the Neils had to satisfy was having a positive NPV. And because Wells Fargo calculated a negative NPV, it could deny a permanent loan modification, and it therefore did not breach the TPP by denying modification.
The Neils say that Wells Fargo used inaccurate information in calculating the NPV because Wells Fargo indicated in its September 2010 letter that the NPV was calculated on October 6, 2009—before the TPP was even signed. But the same letter listed “NPV Input Values” (such as the Neils’ monthly income and obligations) that Wells Fargo did not receive until after October 2009, so the NPV calculation date appears to be a typographical error. Additionally, the letter asked the Neils to “review the input values” and provide documentation within thirty days to correct any inaccuracies, which the Neils didn’t do. J.A. 102. Finally, the Neils do not suggest that the financial information they provided to Wells Fargo before and after October 6, 2009 would have resulted in a positive NPV. Thus, the date of the NPV calculation is inconsequential in deciding whether the Neils fulfilled all the necessary conditions for a permanent HAMP modification.
*218 Finally, while Wells Fargo’s delay in sending the permanent modification rejection letter is regrettable, it is also immaterial. Our holding does not “permit the lender to avoid any responsibility simply by withholding action until the trial period ends.” Dissenting Op. at 225. Had the NPV been positive and had the Neils otherwise fully complied with the TPP, Wells Fargo would have been required to grant a permanent modification effective at the end of the TPP, regardless of when Wells Fargo calculated that NPV. The bank would have had no right to foreclose. Here, though the record may be unclear as to when Wells Fargo determined that the Neils had a negative NPV, it is undisputed that Wells Fargo did so determine, and therefore it was never under any obligation to permanently modify the mortgage loan.
After the TPP’s temporary modification expired in February 2010, the Neils were required to continue making repayments on their original schedule of $3,476 per month until July 2035. Instead, the Neils paid $2,655 until September 2011, at which point they stopped making payments altogether. Wells Fargo notified the Neils that they were in default in March 2010. After the Neils failed to cure their default, Wells Fargo had the right to foreclose on the property, which it did on March 7, 2013. Because the Neils plainly failed to qualify for a HAMP modification, we do not reach the contested factual issue of whether the Neils misrepresented their financial status to Wells Fargo.
We therefore affirm the district court’s grant of summary judgment as to Count I of the Neils’ complaint.
B.
In Counts II and III, the Neils accuse Defendants of Slander of Title and Abuse of Process, respectively. These claims are based on the notion that “there was no default” on the mortgage loan and that Defendants therefore “published false words” and “maliciously misused and/or abused process” by claiming that the Neils had defaulted. J.A. 42-43. Having held that the Neils were required to resume full monthly payments on their mortgage beginning in February 2010, and because they undisputedly did not, there was indeed a default, and Counts II and III necessarily fail.
C.
In Count IV, the Neils ask the court to “Remove Unauthorized Documents from the Land Record,” specifically ones noting that the Neils defaulted and Wells Fargo foreclosed on the Neils’ home. Because the Neils did default and Wells Fargo did— properly—foreclose, there are no false or unauthorized documents in the land record, and Count IV also fails.
D.
We turn now to the district court’s grant of summary judgment to Wells Fargo on its counterclaim for breach of contract, alleging that the Neils still owed $122,462.65 after their home was sold in foreclosure. The Neils first argue that they were never actually in default, and that Wells Fargo therefore had no right to foreclose. Having already dealt with this argument, we address the Neils’ second argument: that Wells Fargo lacked standing to collect, and thus lacks standing to sue, on the Note.
Article III of the U.S. Constitution limits the jurisdiction of federal courts to “Cases” and “Controversies.” U.S. Const, art III, § 2. One element of this constitutional requirement is that claimants must have standing to sue. See, e.g., Clapper v. Amnesty Int’l USA, 568 U.S. 398, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013). *219 The plaintiff—in this case, cross-plaintiff Wells Fargo—bears the burden of establishing the three “irreducible minimum requirements” of Article III standing:
(1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly ... tracefeble] connection between the alleged injury in fact and the alleged conduct of the defendant); and (B) re-dressability (i.e., it is likely and not merely speculative that the plaintiffs injury will be remedied by the relief plaintiff seeks in bringing suit).
David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013) (alteration in original) (internal quotation marks omitted).
The Neils’ mortgage loan (memorialized in a 2005 note) listed “Wells Fargo Bank, N.A.” as the lender. J.A. 54. U.S. Bank later acquired the Note, and U.S. Bank made Wells Fargo the Note’s servicer. The Neils argue that, because Wells Fargo doesn’t hold the Note, it would enjoy no benefit from the Note being paid in full, and therefore suffered no injury-in-fact by the Neils’ default. This is incorrect.
Despite not being the noteholder, Wells Fargo had standing to enforce the Note as its servicer. The Note itself designates the “Loan Servicer” as the party “that collects Periodic Payments due under the Note.” J.A. 80. Virginia—the state whose laws govern the Note—has adopted the Uniform Commercial Code and allows parties to delegate their legal rights to agents as U.S. Bank did here. Va. Code Ann. § 8.1A-103; Lambert v. Barker, 232 Va. 21, 348 S.E.2d 214, 216 (1986). By appointing Wells Fargo as its loan servicer, Wells Fargo became U.S. Bank’s agent with the power to “[d]emand, [sue] for, recover, collect and receive each and every sum of money, debt, account and interest ... belonging to or claimed by U.S. Bank.” J.A. 392. This created a legally protected interest sufficient to grant Wells Fargo standing to sue for the deficiency on the Note. See, e.g., CWCapital Asset Mgmt., LLC v. Chicago Props., LLC, 610 F.3d 497, 500-01 (7th Cir. 2010) (explaining that mortgage-loan servicers, when given authority to collect on notes, have Article III standing and are a party in interest); see also Lambert, 348 S.E.2d at 216 (Virginia allows authorized agents of noteholders to collect on the note as if they were holders.).
We do not reach the question of whether a grant of power of attorney alone suffices to grant standing because U.S. Bank did not grant Wells Fargo power of attorney in a vacuum. “[A]uthorizfetion] to sue based solely on a power of attorney” may not create standing, but “the operative question is whether the plaintiff possesses the right to be enforced.” Marina Mgmt. Servs., Inc. v. Vessel My Girls, 202 F.3d 315, 318-19 (D.C. Cir. 2000) (emphasis added) (internal citations omitted). Here, Wells Fargo did not “solely” have power of attorney, it actually “possessed the right to be enforced” under Virginia law allowing the transfer of the legal rights of a note holder to an agent.
III.
For the reasons given, we affirm the district court’s judgment.

AFFIRMED

. The Neils have divorced. For ease of reference, we identify them collectively in this opinion.

. BWW Law Group and Equity Trustees are nominal defendants. Banc of America Funding Corporation—a trust that lacks the power to sue—is not a party to this appeal. The issues on appeal primarily—if not solely— concern Wells Fargo.

. HAMP is a federal program in which mortgage lenders—including Wells Fargo—voluntarily participate, A borrower who requests a loan modification under HAMP is entitled to a net present value calculation—that is, a determination of whether modifying the loan is worth more to the lender than proceeding to foreclosure. If modification is worth more, the NPV is positive and the lender is required to modify the loan, but if foreclosure is worth more, the NPV is negative and the lender may decline to modify. See, e.g., Bourdelais v. J.P. Morgan Chase, No. 3:10CV670-HEH, 2011 WL 1306311 at *1 (E.D. Va. Apr. 1, 2011).